**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4835-18
               A-4836-18

ML PLAINSBORO LTD
PARTNERSHIP/GOMEZ,[1]

       Plaintiff-Respondent,

v.

TOWNSHIP OF PLAINSBORO,[2]

       Defendant-Appellant.

_____

Argued January 13, 2021 – Decided March 29, 2021

Before Judges Whipple, Rose and Firko.

On appeal from the Tax Court of New Jersey, Docket Nos. 1620-2006 and 2348-2005.

Martin Allen argued the cause for appellant (DiFrancesco, Bateman, Kunzman, Davis, Lehrer & Flaum, PC, attorneys; Martin Allen, of counsel and on the briefs; Kevin A. McDonald and Wesley E. Buirkle, on the briefs).

_____

[1] Improperly pled as ML Plainsboro LP, Etc.

[2] Improperly pled as Plainsboro TP.

Frank E. Ferruggia argued the cause for respondent (McCarter & English, LLP, attorneys; Frank E. Ferruggia, of counsel and on the brief; Daniel P. Zazzali and Priscilla Mieir, on the brief).

PER CURIAM

In these consolidated matters, defendant Township of Plainsboro appeals from two May 28, 2019 Tax Court judgments reducing its 2005 and 2006 tax assessments on two parcels of property owned by plaintiff ML Plainsboro Ltd. Partnership/Gomez (Merrill Lynch). After considering the extensive expert testimony presented by the parties during the lengthy trial, the Tax Court judge determined Merrill Lynch overcame the presumption of correctness of the assessments.

At issue is the valuation methodology and resultant amounts of the assessments. Asserting the generally held presumption of validity that attaches to the quantum of a municipality's assessment of property, with the concomitant burden on the taxpayer to prove that the property's value is otherwise, Pantasote Co. v. City of Passaic, 100 N.J. 408, 412-13 (1985), the Township maintains the applicable method to determine Merrill Lynch's tax liability is the cost approach rather than the income capitalization approach adopted by the Tax Court judge. In that regard, the Township argues the judge erroneously determined the

A-4835-18

highest and best use of the property was rental to a single tenant rather than "as a specialty corporate campus." The Township also challenges the adequacy of the Tax Court judge's factual findings and legal conclusions.

We reject defendant's arguments as unavailing. Having considered the parties' arguments and reviewed the entire record, we affirm, concluding the judge's decision "is based on findings of fact which are adequately supported by evidence." R. 2:11-3(e)(1)(A); see also Yilmaz, Inc. v. Dir., Div. of Tax'n, 390 N.J. Super. 435, 443 (App. Div. 2007).

I.

By way of background, as of the valuation dates in 2005 and 2006, Merrill Lynch owned and occupied the 65.367-acre corporate center located on two lots in the Township: (1) 800 Scudders Mill Road, designated as Block 5.01, Lot 3.07 on the 2005 tax map, and Block 1601, Lot 2 on the 2006 tax map; and (2) Scudders Mill Road, designated as Block 5.01, Lot 3.08 on the 2005 tax map, and Block 1601, Lot 4 on the 2006 tax map. Both parcels comprise a single economic unit (the property). The exact size of the property's rental space was disputed at trial.

The property is accurately described in the Tax Court judge's decision and need not be repeated in detail here. In sum, the improvements on the property

A-4835-18

were built in three phases between 1984 and 1993. The property initially included a hotel conference center, which was sold to a third party prior to the first valuation date. As such, the hotel conference center was not part of the assessments at issue. Instead, the improvements at issue included the office complex, which consisted of nine independent, three-story office buildings or "pods," and an executive office suite.

For the tax year 2005, the total assessment for both lots was $196,908,500; for the tax year 2006, the total assessment was $199,542,460. Following trial, the Tax Court judge reduced the total assessments to $99 million for 2005 and $107,561,000 for 2006. The disparity between the assessments established by the Township and the Tax Court judge was demonstrated through the parties' divergent expert testimony concerning the valuation approach adopted and the highest and best use of the property.

We summarize the competing expert testimony to give context to the Tax Court judge's decision. In doing so, we recognize, as did the judge: "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001). "The choice of

the predominant approach will depend upon the facts of each case and the reaction of the experts to those facts." 125 Monitor Street LLC v. Jersey City, 21 N.J. Tax 232, 238 (Tax 2004) (citing City of New Brunswick v. Div. of Tax Appeals, 39 N.J. 537 (1963)).

A.

Merrill Lynch presented the testimony of Gordon Griffin, an expert in architecture and area measurements. Griffin calculated the property's square footage for Raymond T. Cirz, who testified as Merrill Lynch's expert in real estate valuation.

Cirz testified to his vast thirty-year experience as a real estate appraiser, which included multiple appraisals of large real properties throughout the New Jersey and New York area. Testifying at length about his application of the income capitalization approach to valuation of the property, Cirz explained he surveyed the market to perform his analysis. Cirz considered the general Princeton office market and the southern Middlesex market, which included Plainsboro, Princeton, Monroe, and South Brunswick. Cirz considered the local and regional market, opining that a large corporate entity would consider Plainsboro and the surrounding area when searching for office space. Cirz

collaborated with Cushman and Wakefield, a global real estate firm, to confirm that the property could compete with other parcels on a regional basis.

Cirz estimated the property's market rent by performing an analysis of nine lease transactions for comparable property located in the northern and central New Jersey regions. Cirz researched five large single-tenant leases and four multi-tenant leases. Cirz detailed the comparable leases and analyzed the physical characteristics of the property. He ultimately determined the single-tenant opinion was the best selection for the property.

Referencing photographs admitted in evidence, Cirz explained the physical characteristics of the improvements on the nine properties. Because his firm had previously appraised most of the comparable properties, Cirz was able to review their leasing agreements and spoke with the owners and tenants. Cirz determined the potential gross rent for each of the comparable properties, converting gross rent to net rent where applicable.

When determining market rent, Cirz relied on the present worth of future benefit by considering rent concessions and "rent step-ups." He testified that a tenant could have a lower rent in an initial lease year and experience a higher rent in a subsequent year. Cirz reviewed rents during the initial five-year period. He opined that examining rents over a twenty-year period would not be

appropriate because that timeframe would not reflect market rent or the present worth of future benefit.

Utilizing the income capitalization approach, Cirz assessed the net market rent rate at sixteen dollars per square foot for the above-grade rentable area, and eight dollars per square foot for the below grade storage. He concluded there was nothing special or unique about the property that would prevent another corporate user from occupying or fully utilizing the property.

Cirz then calculated the potential gross rent based on his determination that the above-grade rentable area for a single tenant was 698,722 square feet. Cirz multiplied that square footage by the market rent of sixteen dollars per square foot. Accordingly, the potential gross rent of the office area would be $11,179,552 if rented to a single tenant. The storage area was 32,545 square feet, which was multiplied by a rental rate of eight dollars per square foot to yield potential gross rent from the storage area of $260,360 if rented to a single tenant. Thus, the total potential gross rent for the property from a single tenant scenario was $11,439,912.

Cirz applied a vacancy factor to the potential gross rent for the timeframe in question and explained his reasons for doing so. Cirz also considered operating expenses, opining that in a single-tenant scenario the tenant would pay

A-4835-18

the general operating expenses and the real estate taxes. Cirz made allowances for major capital income components and leasing commissions from brokers to keep the property occupied. He selected a tenant renewal rate of sixty percent, which represented the middle of the range based on historical experience.

Next, Cirz determined a net operating income for the property in a single tenant scenario. Cirz utilized a potential gross rent of approximately $11,439,912, subtracted the ten percent vacancy factor of approximately $1.6 million, and calculated a net operating income of approximately $8.7 million, which represented $12.45 per square foot of rentable office area.

Finally, Cirz derived an appropriate capitalization rate to apply to the net operating income. For the tax year 2005, he calculated a combined capitalization rate of 8.7%; for the tax year 2006 he calculated a combined capitalization rate of eight percent. Explaining his methodology, Cirz calculated a fair market value of $99 million in a fee simple interest for tax year 2005, which was rounded to $109 million for the tax year 2006 for rental to a single tenant. Cirz also calculated the fair market value for a multi-tenant scenario. For the tax year 2005, the fair market value was $84,439,855; for the tax year 2006, the fair market value was $90,480,902. According to Cirz, these calculations supported his testimony that the highest and best use of the property

A-4835-18

was rental to a single tenant. Cirz explained that he considered, but rejected, the use of the cost approach and the comparable sales approach.

In formulating his opinion, Cirz considered the age and condition of the pods. As of the initial assessment date, the first phase of improvements, consisting of five pods that comprised approximately 420,000 square feet, was twenty years old; the second phase of improvements, consisting of three pods that comprised approximately 210,000 square feet, was fifteen years old; and the third phase of improvements, consisting of one pod that comprised approximately 65,000 square feet, was eleven years old.

According to Cirz, each pod had a separate entrance, enabling use by one or more tenants. The nine pods were connected by a common corridor, which was "tired and dated in appearance," as evidenced by "extensive wear and tear" to its ceramic tile floor and mahogany wood panel walls. The cafeteria also exhibited signs of wear and tear. The interior offices had been upgraded periodically and therefore ranged in quality. Sections of the carpet flooring were damaged. Notably, due to its age, the first phase lacked a lasting usable design because the use of personal desktop computers was not foreseen. During the second phase of construction, the floors were designed to include a conduit that accommodated increased computer use.

9

Although the executive area included upgraded finishes, its overall appearance was "quite dated," marred by wear and tear. The executive area contained less than 6000 square feet and represented less than one percent of the total rentable area.

Overall, the construction of the buildings was "average" for the market and competitive properties. The frames were made of steel and the exterior panels were precast concrete, which was "pretty typical of office building construction." Cirz opined that the aging roof would soon need replacement. The central heating and cooling equipment were original. As such, the "chillers" would require upgrading to comply with changes in environmental laws. A fountain located on the property had deteriorated significantly and was not operational at the time of Cirz's valuation. The complex was serviced by ten passenger elevators and two freight elevators, all of which were original to the complex.

B.

The Township presented the testimony of its cost estimator, Joseph Novelli, and its appraiser, Pamela J. Brodowski. Both experts advanced their conclusions using the cost approach.

10

Novelli, a certified general appraiser specializing in the cost approach, assisted the Township in creating the property's appraisal. He opined that the level of maintenance performed on the property's improvements was "excellent." For example, the executive area had highly priced hardware, and the kitchen area was commercial grade and state-of-the-art.

Novelli explained his portion of the appraisal using the cost approach. Novelli looked at "the buildings and site improvements." He estimated construction costs using the Means Construction Manuals (Means) for the appropriate years. Novelli explained that he entered the zip code representing the location of the project into his Means computer software, which automatically modified the national rate to the local rate. When Means did not list the cost for a component, Novelli used his "personal experience" and "ask[ed] around in the industry" to determine the costs.

On cross-examination, Novelli explained a building designed for a special purpose, such as a power plant or asphalt plant, lacks comparable sales. Novelli acknowledged the property's improvements consisted of pods that were part of a larger office complex. He believed the improvements amounted to "a single-tenant occupancy with certain design features that would make it a special purpose office."

11

However, Novelli conceded that any other general office user could use the property. And he acknowledged that the property was an office complex and not a special-purpose building. Novelli further acknowledged he modified certain data concerning the property's components and designs so that he could estimate the costs through the use of the Means software program. Novelli further acknowledged a computer error in certain computations and that his son inputted the numbers into the Means software program – without Novelli's supervision. He calculated the reproduction cost for new improvements at $251,642,656.

Brodowski previously inspected the property as part of a prior tax appeal. Based upon Novelli's calculations from the 1990s, she testified that the property had a gross square footage of 824,195, excluding the parking and underground parking tunnels. Brodowski relied upon Novelli's computations and cost analysis in her valuation of the property. Brodowski testified that the improvements were well maintained. Although the interior of the complex exhibited normal wear and tear, Brodowski noted Merrill Lynch invested capital yearly.

Brodowski concluded that the highest and best use of the property was by a single corporate user as a special purpose property. She opined that Merrill

12

Lynch attempted to create a corporate campus of the "highest quality" and the property was built for Merrill Lynch's "specific needs" as a "unique facility."

Brodowski considered the income capitalization approach and the sales of comparable properties but emphasized that the best method to use in this matter was the cost approach. In reaching her conclusion, Brodowski relied on Novelli's replacement cost estimates that used the Means data. She also considered the actual costs, as trended from 1992 to the valuation date, and the comparable properties in the area. In that regard, Brodowski opined that the property was located in a good economic area that encompassed other unique properties, such as office buildings used by Princeton University, Bristol Meyers Squibb, and other large corporations.

In terms of aging the improvements, Brodowski used an effective age of sixteen years. She opined that the total fair market value of the property was $214.5 million for tax year 2005 and $223 million for tax year 2006.

Regarding the income capitalization approach, Brodowski discussed five comparable leases that she utilized to establish market rent for the properties. Yet during cross examination, Brodowski acknowledged she did not review any of the actual leases and did not have any information regarding the actual tenant improvement allowances. Although Brodowski believed the property was a

13

special purpose, she acknowledged there was nothing special or unique about the property that would preclude corporate entities other than Merrill Lynch from utilizing the space. She also acknowledged the property was not utilized as Merrill Lynch's corporate headquarters, which was located in New York City.

## II.

Although we review a Tax Court's legal determinations de novo, Toll Bros. v. Twp. of W. Windsor, 173 N.J. 502, 549 (2002), our review is highly deferential, Estate of Taylor v. Dir., Div. of Taxation, 422 N.J. Super. 336, 341 (App. Div. 2011). Our deference "take[s] into account the special expertise of Tax Court judges in matters of taxation." Dover-Chester Assocs. v. Randolph Twp., 419 N.J. Super. 184, 195 (App. Div. 2011). We owe "due regard to the Tax Court's expertise and ability to judge credibility." Southbridge Park, Inc. v. Borough of Fort Lee, 201 N.J. Super. 91, 94 (App. Div. 1985). Judgments of the Tax Court are binding on appeal when supported by adequate, substantial, and credible evidence in the record. See Yilmaz, Inc., 390 N.J. Super. at 443.

In his thorough written decision, the Tax Court judge detailed the applicable law, initially recognizing the well-established principles that "[o]riginal assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of

Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). But the judge determined that presumption was overcome here, where Merrill Lynch established sufficient credible evidence to the contrary. See Twp. of Little Egg Harbor v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998); see also MSGW, 18 N.J. Tax at 373.

Having determined the presumption was overcome, the Tax Court judge next considered the evidence adduced by the parties. In doing so, the judge analyzed the law concerning the "highest and best use" of the property. See Clemente v. Twp. of S. Hackensack, 27 N.J. Tax 255, 268 (Tax 2013) (defining highest and best use as "[t]he reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in highest value"). In that regard, the judge determined Cirz "offer[ed] the most credible opinion on this point."

In reaching his decision, the Tax Court judge cited the significance of the sale of the hotel conference center "just prior to the first valuation date," which "severed" the center from the property. The judge elaborated:

> While located immediately adjacent to the subject property, those amenities are no longer under unified ownership with the subject. The corporate campus was, in effect, disassembled in the 2004 transaction. The court finds credible the [Cirz]'s opinion that a single user seeking a corporate campus setting is unlikely to

15

rent the subject property, given its entanglement with the adjoining hotel conference and training center owned by another entity. The subject property instead will be most productive as rental property to the typical office[] user.

Having concluded that the "property's highest and best use [wa]s for rental in the office market, the judge conclude[d] that the income capitalization approach was the most credible method for determining the . . . property's true market value." The judge explained his findings, comparing the testimony of the competing experts. In that context, the judge exposed the flaws in the testimony of Novelli and Brodowski as stated above.

Conversely, citing Cirz's vast experience and detailed analysis of the property, the Tax Court judge credited the expert's conclusions on market rent, building size, vacancy and collection rate, operating expenses, capitalization rate and calculation of value. Contrary to the Township's contentions on appeal, the judge explained his findings.

Moreover, the substantial credible evidence in the record supports the Tax Court judge's conclusion that Merrill Lynch initially overcame the presumption of validity attached to the tax assessments under review, Pantasote, 100 N.J. at 413. In reaching our decision, we reject the Township's contention that a cost approach valuation was required to overcome the presumption of validity.

Pursuant to N.J.S.A. 54:4-23, real property should be assessed at "true value," which is the value that the real property would realize at a fair private sale. See City of Newark v. W. Milford Twp., Passaic Cty., 9 N.J. 295, 303 (1952). The Court has long recognized the statute does not require the use of any one method of assessing true value. Riverview Gardens v. N. Arlington Borough, 9 N.J. 167, 175 (1952). Similarly, we have held there is no single approach that must be followed in valuing real property. Samuel Hird & Sons, Inc. v. Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965). Indeed, the valuation approach utilized "depends upon the particular facts and the reaction to them of experts steeped in the history and hopes of the area." City of New Brunswick, 39 N.J. at 544. In sum, Merrill Lynch presented sufficient credible evidence to support the Tax Court judge's conclusion that the presumption of validity was overcome here. See Riverview Gardens, 9 N.J. at 175.

Similarly, we are not persuaded by the Township's renewed contention that the highest and best use of the property was for a special purpose, where the credible evidence in the record here sufficiently supports the Tax Court judge's conclusion otherwise. R. 2:11-3(e)(1)(A). Indeed, the Township's experts agreed with Cirz that nothing prevented another occupant from utilizing the property as general office space.

17

In sum, the record developed in the Tax Court amply supports the judge's decision and the judgments he entered, which in turn are amply explained by his cogent opinion. We therefore affirm substantially for the reasons articulated by the Tax Court judge in his well-reasoned written decision. To the extent not specifically addressed, the Township's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4835-18